B.B. RIDER CORP. ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent B. B. Rider Corp. v. Commissioner
Dockets Nos. 7883-74, 7887-74, 7039-77, 9214-77, 9227-77.
United States Tax Court
T.C. Memo 1982-98; 1982 Tax Ct. Memo LEXIS 653; 43 T.C.M. (CCH) 637; T.C.M. (RIA) 82098; February 23, 1982. *653 Held: (1) Extent to which proceeds of certain checks issued by petitioner B.B. Rider Corp. during its taxable years 1966 and 1967 were paid as interest on loans from various individuals, including petitioner John Howald, or were retained by petitioner Benjamin Stratmore determined. (2)(a) Petitioner B.B. Rider Corp. is not entitled to deductions claimed for interest on "loans discounted and repaid" for its taxable years 1966 and 1967. (b) "Loans discounted and repaid" do not constitute additional income to petitioner Benjamin Stratmore. (3) Petitioner B.B. Rider Corp. is not entitled to deduct certain payments, now claimed to constitute additional compensation to Benjamin Stratmore, where it has not been shown that such payments were made purely for services. (4) Amount of petitioner B.B. Rider Corp.'s net operating loss deductions for the taxable years 1966 and 1967 determined. (5) Payments made by petitioners Benjamin and Helen Stratmore during 1961 through 1971 and 1973, as guarantors of obligations of B.B. Rider Corp., are deductible as nonbusiness bad debts, where petitioners have not proved that their dominant motive in executing guaranties was the protection of their jobs. *654 (6) Interest paid by petitioners Benjamin and Helen Stratmore, as guarantors, on obligations of B.B. Rider Corp. is deductible as nonbusiness bad debts. (7) Respondent's determination of reasonable compensation for petitioner Benjamin Stratmore's services sustained. (8)(a) No part of the underpayment of tax of petitioner B.B. Rider Corp. for its taxable years 1966 and 1967 is due to fraud. (b) Since the income tax return filed by petitioner B.B. Rider Corp. for its taxable year 1966 is not a fraudulent return, the period for assessing any tax due for such taxable year has expired. (9)(a) Petitioners Benjamin and Helen Stratmore did not act fraudulently in filing their 1966 and 1967 tax returns. (b) By reason of the statute of limitations, no tax may be assessed for petitioners Benjamin and Helen Stratmore's 1966 taxable year. (10)(a) No fraud existed as to petitioners John and Mary Howald's 1966 and 1967 income tax returns. (b) The statute of limitations bars assessment as to petitioners John and Mary Howald's 1966 and 1967 tax years. John J. O'Toole, for the petitioners in docket Nos. 7883-74, 7887-74, 9214-77, and 9227-77. Herbert L. Zuckerman, for the petitioner in docket *655 No. 7039-77. William M. Gross and Andrew I. Panken, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent has determined the following deficiencies in tax and addition to tax pursuant to section 6653(b) [2]: Section 6653(b)
Docket
No.
Petitioner
Year
Deficiency
Addition to Tax
7883-74
B.B. Rider Corp.
Taxable Year
Ended
October 31, 1966
$ 21,791.32
$ 10,895.66
Taxable Year
Ended
October 31, 1967
89,622.65
44,811.33
7887-74
Benjamin and
1961
24,217.58
Helen
1962
30,794.50
Stratmore
1963
6,573.80
1964
19,404.85
1965
11,302.72
1966
56,546.40
28,273.20
1967
37,401.88
18,700.94
1968
27,281.45
1969
27,872.24
1970
22,730.09
1971
10,725.38
7039-77
John Howald and
1966
14,192.90
7,096.45
Mary Howald [3] *656 1967
8,111.60
4,055,58
9214-77
B.B. Rider Corp.
Taxable Year
a/k/a General
Ended
Manufacturing
October 31, 1967
1,235.00
Corp.
[4]
Taxable Year
Ended
October 31, 1969
31,422.00
Taxable Year
Ended
October 31, 1970
54,182.00
Taxable Year
Ended
October 31, 1974
47,129.00
9227-77
Benjamin
Stratmore
and Helen
Stratmore
1973
1,149.00
Concessions having been made the following issues remain for decision: (1) Whether, and to what extent, the proceeds of checks issued by petitioner B.B. Rider Corp. during its taxable years 1966 and 1967 of $ 70,660 and $ 68,500, respectively, were paid as interest on loans from various individuals, including petitioner John Howald, or were retained by petitioner Benjamin Stratmore; (2) Whether petitioner B.B. Rider Corp. is entitled to interest deductions for "loans discounted and repaid" for its taxable years 1966 and 1967 in the amounts of $ 8,400 and $ 100, respectively; (3) Whether petitioner B.B. Rider Corp. is entitled to deductions for payments to petitioner Benjamin Stratmore of $ 67,843 and $ 17,365 for its taxable years 1966 and 1967, respectively. These amounts were deducted as travel and entertainment expense and are now claimed as additional *657 compensation; (4) The amount of petitioner B.B. Rider Corp.'s net operating loss deductions for the taxable years 1966 and 1967. This issue depends upon whether petitioner B.B. Rider Corp. is entitled to deductions for claimed travel and entertainment expenses for its taxable years 1961, 1964 and 1965; (5) Whether payments made by petitioners Benjamin and Helen Stratmore, during 1961 through 1971 and 1973, as guarantors of corporate obligations are deductible as business or nonbusiness bad debts; (6) Whether interest paid by petitioners Benjamin and Helen Stratmore upon the corporate obligations in Issue (5) during 1966-1971 is deductible as interest or as nonbusiness bad debts; (7) Whether petitioner B.B. Rider Corp. a/k/a General Manufacturing Corp., paid excessive compensation to petitioner Benjamin Stratmore during its taxable years 1970, 1972, 1973 and 1974. The taxable years 1972 and 1973 are in issue due to claimed net operating loss carrybacks to the taxable years 1969 and 1970 and a claimed net operating loss carryforward to the taxable year 1974; [5] *658 (8) Whether any part of the underpayment of tax, if any, of petitioner B.B. Rider Corp. for its taxable years 1966 and 1967 is due to fraud and, consequently, whether the statute of limitations has expired as to the taxable year 1966; (9) Whether any part of the underpayment of tax, if any, of petitioners Benjamin and Helen Stratmore for 1966 and 1967 is due to fraud and, consequently, whether the statute of limitations has expired as to 1966; (10) Whether any part of the underpayment of tax, if any, of petitioners John Howald and Mary Howald for 1966 and 1967 is due to fraud (see note 3, supra) and, consequently, whether the statute of limitations has expired as to those years; (11) Whether petitioner Mary Howald is relieved of liability, under the provisions of section 6013(e), for the year 1966. FINDINGS OF FACT GENERAL
Some of the facts have been stipulated and are found accordingly. The stipulations of facts together with exhibits attached thereto are incorporated herein by this reference. Petitioner B.B. Rider Corp. (now General Manufacturing Corporation) maintained its principal place of business in Clifton, New Jersey *659 when it filed its petitions herein. Petitioners Benjamin Stratmore and Helen Stratmore resided in Passaic, New Jersey when they filed their petitions herein. Petitioners John Howald and Mary Howald were residents of Newton, New Jersey when they filed their petition herein. The common thread in these consolidated cases is whether certain payments made by petitioner B.B. Rider Corp. (Rider) to petitioner Benjamin Stratmore (Stratmore) during 1966 and 1967 were retained by Stratmore or were paid by Stratmore to third parties as interest on loans made to Rider. Our answer to this question will determine whether Rider is entitled to interest deductions, whether Stratmore received unreported income from Rider and whether petitioner John Howald (Howald) received unreported interest income from Rider.Additionally, respondent's assertion of additions to tax for fraud for Rider and Stratmore is based upon the nature of these payments. In the case of Rider, respondent also bases the additions to tax for fraud on Rider's claimed travel and entertainment deductions for those years. Although Rider reports its income on the basis of a fiscal year ended October 31, we will refer for purposes *660 of convenience to Rider's taxable years only by the calendar year within which the fiscal year ended. Rider was a New Jersey corporation organized in 1923 as an authorized Frigidaire franchisee for a large area of Northern New Jersey. Stratmore began his career with Rider in 1932 as credit manager. In 1937 or 1938 Rider's president became ill and requested Stratmore to buy Rider from him. Stratmore borrowed about $ 15,000 and, along with his two brothers, I. W. Stratmore (Bill Stratmore) and M. A. Stratmore, purchased Rider. Rider operated an office, repair shop and parts department, all located in Passaic, New Jersey. In about 1967 Rider moved its operations to Clifton, New Jersey. Stratmore and M. A. Stratmore concentrated on Rider's financing and sales while Bill Stratmore devoted his energies to Rider's repair shop. During each of the years in issue Rider's stock was held as follows: Stratmore
25%
Helen Stratmore
8 1/3%
Bill Stratmore
33 1/3%
M. A. Stratmore
33 1/3%
Stratmore served as President and Chief Financial Officer, Helen Stratmore (Helen) as Vice-President and Office Manager, Bill Stratmore as Assistant Secretary and Plant Manager and M. A. Stratmore as Secretary-Treasurer. *661 M. A. Stratmore died in 1975 and Rider redeemed his shares after his death. Since that time Stratmore, Helen and Bill Stratmore have owned all of Rider's outstanding shares, 37.5 percent, 12.5 percent, and 50 percent, respectively. General Manufacturing Corp. (General) was incorporated in 1950 to manufacture precision components for airplane engines. General currently manufactures silver bearings for piston engines and fuel injection system for jet engines. General's plant is located in Lodi, New Jersey and its offices in Clifton, New Jersey. General was originally capitalized with a $ 50,000 loan from Rider, which had, in turn, borrowed that sum based on Stratmore's guarantee. Stratmore is President and Chief Financial Officer of General and Bill Stratmore, who is in charge of General's plant, is Manager, Secretary and Treasurer of General. Although General manufactured quality components it was not a commercial success. In 1956 General avoided serious financial difficulty, but in August of 1957 both General and Rider filed for bankruptcy reorganizations under Chapter XI of the Bankruptcy Act, 11 U.S.C. Sec. 701 et seq.[6] Many of the issues in these cases arise from these *662 bankruptcy proceedings, which terminated in December of 1958. In November 1959 Rider and General merged and the name of the merged corporation was B.B. Rider Corporation. Rider's refrigeration division continued to lose money and was sold in 1968. In November 1969 Rider's name was changed to General Manufacturing Corp. and has remained so to the present time. For purposes of convenience the merged corporation shall hereafter be referred to as Rider/General. Issue (1)
FACTS One of the effects of the corporate bankruptcies was to greatly diminish Rider/General's credit. Stratmore, as Chief Financial Officer of the corporation, turned to borrowing from various individuals, who frequently required Stratmore and Helen's personal guarantee. Rider/General borrowed from several individuals, including John Pizzuto (Pizzuto), Louis Junquera (Junquera), John Welsh, Charles Roosma, Esther Stratmore (Stratmore's mother), Garrett Roosma (Roosma) and Howald. Junquera made short-term loans to Rider/General at a 10 percent monthly interest rate. Stratmore accepted this *663 interest rate, with some objections, as a condition of the loans because of Rider/General's often desperate need for operating capital. For loans made to Rider/General by check, Stratmore agreed to pay Junquera one-half of the interest by check and one-half of the interest by cash, however the notes or post-dated checks evidencing Rider/General's indebtedness to Junquera stated a 5 percent interest rate. For cash loans made by Junquera, Stratmore agreed to pay all of the interest in cash. Junquera would not have loaned money to Rider/General unless Stratmore had agreed to pay cash interest to him. Junquera required weekly interest payments of 2-1/2 percent of the principal. Pizzuto also made loans to Rider/General at a 10 percent monthly interest rate. The same arrangement was made with Pizzuto as with Junquera: one-half of each interest payment was made by check, the other half by cash, while the promissory note or post-dated checks provided for 5 percent interest. Unlike Junquera, Pizzuto required monthly interest payments. Stratmore obtained the cash to pay Junquera and Pizzuto in the following manner. Rider/General would issue a check to Stratmore and, occasionally, to *664 Stratmore and a second payee. Stratmore would cash the check and give the cash to Junquera or Pizzuto. When the check was made payable to Stratmore and a second payee, the second payee's name would be deleted and Stratmore would then cash the check. Occasionally Helen would negotiate the check and give the cash to Stratmore and occasionally an employee of Rider/General would deliver the cash to Junquera or Pizzuto. At the requests of Junquera and Pizzuto, Rider/General issued annual Form 1099's to Junquera and Pizzuto which included only the interest paid by check to Junquera and Pizzuto. Pizzuto sent Stratmore statements detailing the amount of interest which should be stated on his Form 1099 so that the amount stated on his tax return as interest received from Rider/General would match with the Form 1099 amount. These Forms 1099 were issued to Junquera and Pizzuto but were not submitted by Rider/General to the Internal Revenue Service. The Form 1099 were prepared by Helen, who also knew that the amounts thereon were false. Stratmore felt that the nature of the loans from Pizzuto and Junquera to Rider/General was so unusual that he would need some proof, other than his own *665 narrative, of the loans. To this end, Stratmore obtained a recording device which he used to covertly tape some of his meetings with Junquera and Pizzuto. Transcripts of five meetings were admitted into evidence herein, four with Junquera and one with Pizzuto. The transcripts do not reveal how much cash interest Stratmore paid to those persons but do reveal that Rider/General was being charged a 10 percent interest rate. During 1966 and 1967 Howald was employed as an engineer. Howald was a long-time customer of Prospect Park National Bank (Prospect Park) and had a credit line with Prospect Park. Howald's account with Prospect Park was handled by Roy Kay (Kay) a Vice-President of the bank. Stratmore had previously been a customer at Prospect Park but, due to the bankruptcies, had been asked to close his account there. Prospect Park was located about 6 to 8 miles, or at least one-half hour by car, from Rider/General's offices. Rider/General's bank was located in Clifton, much nearer its offices. Howald had previously acquired a print machine upon the debtor's default on a loan made by Howald. Through either Kay or Ted Boss (a business acquaintance), Howald learned of Rider/General's *666 financial difficulties. After an inspection of Rider/General's shop, Howald decided that he should lend funds to the corporation, secured by a chattel mortgage on its machinery. It was at this time that Howald first became acquainted with Stratmore. [7]
Unlike Junquera and Pizzuto, Howald had little, if any, contact with Stratmore. Howald drew upon his credit with Prospect Park in making loans; loans by Howald to Rider/General were issued directly from Prospect Parkto Rider/General. The loan accounts for loans to and from Howald were handled by Kay. Howald charged the same interest on loans he made as was being charged by Prospect Park on loans made to him. Loans made by Howald were often made in the name of Howald Factoring Company (Howald Factoring), *667 a bank account at Prospect Park originally established by Howald and his mother for use in obtaining discounts for prompt payment on merchandise ordered by Howald's former corporation. During 1966 and 1967 Howald Factoring, as well as Howald personally, made loans to Rider/General. During 1966 the following checks of Rider/General, payable to Howald Factoring were endorsed by Howald: Check number
Date of Check
Amount
3980
December 19, 1966
$ 1,000
3981
December 27, 1966
1,000
3982
December 12, 1966
500
Total
$ 2,500
During 1967 the following checks of Rider/General, payable to Howald Factoring, were endorsed by Howald: [8]
Check number
Date of Check
Amount
4509
March 3, 1967
$ 500
4510
March 10, 1967
500
4512
March 17, 1967
500
4513
March 24, 1967
500
4514
March 31, 1967
500
5394
April 14, 1967
500
5395
April 21, 1967
500
5396
April 28, 1967
500
5397
May 5, 1967
500
5398
May 12, 1967
500
5919
May 19, 1967
500
5920
May 26, 1967
500
5921
June 2, 1967
500
5922
June 9, 1967
500
Total
$ 7,000
Howald's endorsement on these checks read "Howard Factoring Co, John Howald." Howald does not recall *668 how the proceeds of these checks were disposed of. During 1966 the following checks of Rider/General, payable to Howald Factoring, were endorsed by Kay: Check number
Date of Check
Amount
1506
June 1, 1966
$ 362.92
1844
July 1, 1966
360.48
1847
July 29, 1966
403.70
2378
September 1, 1966
533.84
2932
October 3, 1966
415.13
3438
November 1, 1966
393.16
3758
November 15, 1966
500.00
3828
December 2, 1966
334.86
Total
$ 3,304.09
During 1967 the following checks of Rider/General, payable to Howald Factoring, were endorsed by Kay: Check Number
Date of Check
Amount
4277
January 3, 1967
$ 156.50
4515
February 1, 1967
207.76
4933
March 3, 1967
142.71
5548
April 4, 1967
267.45
5989
May 2, 1967
174.07
6357
June 5, 1967
73.33
0158
August 3, 1967
2,028.76
Total
$ 3,050.58
The checks endorsed by Kay were endorsed "For Deposit Only, Howald Factoring Co." Check number 0158, dated August 3, 1967, is recorded on Rider/General's interest expense distribution card as representing $ 500 of interest expense. Rider/General's loan card for the account of Howald Factoring contains the following entry for check no. 0158: "Part of check, August 3 '67, 158, $ 1,175.61 * * *." During 1966 the following checks of Rider/General, payable to Stratmore and a second payee *669 (the name of which was deleted), were cashed at Prospect Park by Stratmore with Kay's approval: [9]
Check Number
Date of check
Amount
878
May 3, 1966
$ 765.00
1186
April 29, 1966
800.00
1188
May 3, 1966
620.00
1190
May 5, 1966
400.00
1505
June 1, 1966
725.83
1865
July 1, 1966
720.98
1867
July 18, 1966
1,250.00
1868
July 21, 1966
$ 1,250.00
2093
July 29, 1966
807.42
2582
October 3, 1966
830.27
2649
September 1, 1966
1,067.73
3355
October 28, 1966
500.00
3356
October 28, 1966
500.00
3421
November 10, 1966
1,000.00
3426
November 1, 1966
786.32
3431
November 3, 1966
1,000.00
3759
November 15, 1966
1,000.00
3760
November 15, 1966
1,000.00
3761
November 15, 1966
1,000.00
3762
November 15, 1966
1,000.00
3788
November 28, 1966
1,000.00
3789
November 28, 1966
1,000.00
3790
November 28, 1966
1,000.00
3791
November 28, 1966
1,000.00
3792
November 28, 1966
1,000.00
3827
December 2, 1966
669.72
Total
$ 22,693.27 During 1967 the following checks of Rider/General, payable to Stratmore and a second payee (the name of which was deleted) were cashed by Stratmore at Prospect Park with Kay's approval: Check Number
Date of Check
Amount
3344
May 18, 1967
$ 1,000.00
4106
January 20, 1967
1,000.00
4107
January 27, 1967
1,000.00
4145
February 3, 1967
1,000.00
4146
February 10, 1967
1,000.00
4147
February 17, 1967
1,000.00
4164
January 3, 1967
313.00
4378
May 29, 1967
1,000.00
4384
February 2, 1967
415.52
4665
June 9, 1967
1,000.00
4671
April 7, 1967
500.00
4891
April 4, 1967
534.88
5081
March 3, 1967
285.42
5196
April 27, 1967
1,000.00
5197
April 17, 1967
1,000.00
5198
March 17, 1967
1,000.00
5199
March 27, 1967
1,000.00
5232
April 6, 1967
$ 1,000.00
5700
May 8, 1967
1,000.00
6172
May 2, 1967
348.16
6527
June 2, 1967
146.68
Total
$ 16,543.66
Check *670 number 5010, dated March 1, 1967, in the amount of $ 1,000, which Stratmore and respondent agreed Stratmore cashed at Prospect Park with Kay's approval, did not bear Kay's customary notation, "OKK," nor was it cashed at Prospect Park. Rather, the check was endorsed by Stratmore and stamped "For Deposit Only, Garrett Roosma, Jr." and was negotiated at New Jersey Bank and Trust Company. Check number 0159, dated August 3, 1967, in the amount of $ 500, which Stratmore and respondent agreed Stratmore cashed at Prospect Park with Kay's approval, it did not bear Kay's approval, nor was it cashed at Prospect Park. Rather, check number 0159 was endorsed by Stratmore and Helen Stratmore, and was negotiated at the Franklin Bank in Paterson, New Jersey. Some time prior to November 29, 1966 Roosma advanced $ 35,000 to Rider/General. As of January 26, 1967 a balance of $ 32,914.71 remained on this loan. On March 3, 1967 and March 14, 1967, Howald made payments to Roosma of $ 30,000 and $ 5,000 respectively, which payments were made for Howald Factoring in replacement of Roosma as creditor on the $ 35,000 loan.[10] *671 Thereafter, a demand note dated March 3, 1967 from Rider/General to Howald Factoring, in the amount of $ 29,499.87 was executed, such amount being the outstanding balance due on the $ 35,000 loan as of February 23, 1967. [11] Howald Factoring received final payment on the loan by way of Rider/General check number 0158, discussed supra.
Rider/General used the following system to record its loans. When the proceeds of a loan were received they would be deposited in Rider/General's bank account. Helen prepared Rider/General's deposit slips. The deposit would be recorded by the bookkeeper in a cash receipt journal and would also be posted to an individual ledger card ("loan card") for the specific lender. Total monthly transactions were posted to the general ledger as note payables. Lenders of cash were identified to the *672 bookkeeper by Stratmore. When Rider/General paid principal and interest on a loan an entry of the total amount of payment would be made in a check disbursement journal. The principal paid, and frequently the interest, would be posted on the individual ledger card. The amount of interest paid was posted on an interest expense distribution card which, unlike the individual ledger cards, was not kept individually for each lender. When a check was issued to Stratmore and posted by Rider/General on its interest expense distribution cards the identity of the lender named on the cards was given to the bookkeeper by Stratmore. During Rider/General's taxable years 1966 and 1967 the following amounts were issued by way of Rider/General checks drawn as follows: Payee(s)
Taxable Year 1966
Taxable Year 1967
Stratmore and others
$ 59,882
$ 68,500
Stratmore
10,778
Total
$ 70,660
$ 68,500
During the taxable years 1966 and 1967, Rider/General claimed deductions for cash interest paid to the following individuals: Taxable Year 1966
Taxable Year 1967
John Welsh
$ 6,200
$ 2,475
Charles Roosma
2,400
2,363
Esther Stratmore
1,012
1,000
Garrett Roosma
400
100
J. Feder
500
250
L.M. [12]
400
John Pizzuto
12,450
7,743
Cedar Knolls Enterprises
3,463
2,000
John Howald (t/a Howald
Factoring)
10,237
30,500
Louis Junquera
22,820
22,069
Unallocated
10,778
Total
$ 70,660
$ 68,500
*673 By letter dated June 28, 1974, respondent disallowed in full Rider/General's deductions for those claimed interest payments. By letter dated June 28, 1974 respondent determined that Stratmore received during 1966 and 1967, from Rider/General's alleged interest payments, $ 92,828.62 and $ 44,706.75, respectively. Respondent further determined that of the $ 92,828.62 received by Stratmore during 1966, $ 59,963.62 was taxable as a dividend, $ 12,500 constituted a return of capital and $ 20,365 was taxable as long-term capital gain pursuant to section 301(c)(3)(A). Respondent determined that the entire $ 44,706.75 received by Stratmore during 1967 was dividend income to him. By letter dated May 4, 1977, respondent determined that Howald received unreported cash interest from Rider/General during 1966 and 1967 of $ 26,820.37 and $ 26,565.48, respectively, consisting of the following amounts (see pp. 13-17): 1966
1967
Checks issued to Howald Factoring
$ 5,804.09 * *674 $ 8,521.82
Checks issued to Stratmore
22,693.27 18,043.66
Sub-Total
$ 28,497.36 $ 26,565.48
Interest reported on return
(1,676.99)
Unreported Interest
$ 26,820.37 $ 26,565.48
OPINION Section 61(a) provides that gross income means all income from whatever source derived, including interest (section 61(a)(4)) and dividends (section 61(a)(7)). Section 163 allows as a deduction all interest paid or accrued within the taxable year on indebtedness.Generally speaking, a corporation is not entitled to a deduction for dividends paid to its shareholders. Rider/General's interest deductions thus depend upon whether Stratmore received dividends or individual lenders were paid interest.
Respondent asserts that the proceeds of numerous checks issued by Rider/General during its taxable years 1966 and 1967, including checks issued to Howald, were actually retained by Stratmore. Respondent also maintains that the proceeds of some of the same checks were received as interest by Howald. Thus, respondent's position as to possible payments from Rider/General to Howald is that of stakeholder. Rider/General *675 and Stratmore both contend that the proceeds of the checks in issue were paid by Stratmore to lenders as interest.Howald, on the other hand, asserts that he received no cash payments of interest from Stratmore and also questions his receipt of the Rider/General checks to Howald Factoring which were endorsed by Kay. Respondent has conceded that any amounts which we find to be interest to the various "lenders" must be allowed as deductions to Rider/General and cannot be income to Stratmore. These cases were previously consolidated with those of Junquera (docket No. 9143-76) and Pizzuto (docket No. 9149-76). Respondent had determined that Junquera received $ 25,772 and $ 26,382 in interest during 1966 and 1967, respectively, from Rider/General. After filing a petition with this Court, Junquera conceded the entire deficiency.Similarly, respondent had determined that Pizzuto received $ 16,777 and $ 6,151 in interest during 1966 and 1967, respectively, from Rider/General. Pizzuto's case was initially consolidated herewith, but subsequent to the trial Pizzuto conceded that he received interest of $ 5,433 and $ 2,050, during 1966 and 1967, respectively. Despite the difference in the *676 taxable years of Rider/General with those of Junquera and Pizzuto, respondent has conceded, and Rider/General agrees, that Rider/General is entitled to total interest deductions of $ 31,205 ($ 25,772 plus $ 5,433) for its taxable year 1966 and $ 28,432 ($ 26,382 plus $ 2,050) for its taxable year 1967. Respondent has similarly conceded, and Stratmore agrees, that Stratmore did not receive $ 31,205 and $ 28,432 during 1966 and 1967, respectively. Rider/General and Stratmore maintain that because respondent "introduced no substantive evidence as to either the interest issue or the dividend issue, but relied upon a presumption that since he could not trace the payments into the hands of the lenders he was warranted in alleging income to both the petitioners [Rider/General and Stratmore] in this case, and to the lender," then respondent's determination cannot be sustained. Rider/General and Stratmore argue that a mere susicion or presumption on respondent's part does not permit respondent to rely on the presumption of correctness of his determination without a "minimal evidentiary foundation" and that before respondent can rely upon the presumption he must present some substantive evidence, *677 citing Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Gerardo v. Commissioner,552 F.2d 549 (3rd Cir. 1977), revg. a Memorandum Opinion of this court; and Jackson v. Commissioner,73 T.C. 394 (1979). Although Rider/General and Stratmore have not characterized the notices of deficiency as being "without rational foundation" Helvering v. Taylor,293 U.S. 507 (1935), in essence they are asking us to look behind the notices of deficiency. As a general rule, we will not look behind a notice of deficiency to examine the evidence used, the respondent's motives or administrative policy or procedure in making the determination, Jackson v. Commissioner,supra at 400; Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). We have recognized a rare exception to this rule in cases involving unreported income where the respondent introduced no evidence but rested upon the presumption of correctness and the petitioner challenged the notice of deficiency on the grounds that it was arbitrary, Llorente v. Commissioner,74 T.C. 260, 264 (1980), affd. in part, revd. in part and remanded 649 F.2d 152 (2nd Cir. 1981); Jackson v. Commissioner,supra at 401. *678 Rider/General is seeking a deduction for interest paid. This is not a case, as far as Rider/General is concerned, of unreported income. Thus, the element of unreported income, fundamental to the narrow exception set forth in Jackson and Llorente, is not present and we will not go behind the notice of deficiency issued to Rider/General. [13]
We also find the cases relied upon to be inapposite to Stratmore. In Gerardo,Jackson and Weimerskirch the question was whether the petitioner could be linked with the activity which respondent asserted produced the unreported income. Here, no such problem exists.Stratmore stipulated with respondent that he received the proceeds of the checks, the only issue being whether Stratmore passed those proceeds on to others as interest payments or retained them for his personal use. Furthermore, respondent has done more than merely rely upon the presumption of correctness herein; respondent's witnesses included Kay, whose testimony was contradictory to Stratmore's, and respondent cross-examined virtually every witness concerning the payments in issue dispite an essentially neutral posture. Accordingly, *679 we will not look behind the notice of deficiency issued to Stratmore.[14] *680 *681 Rider/General and Stratmore next assert that they must prevail on this issue because the evidence which they presented was unequivocal and went uncontradicted by the respondent, relying on Demkowicz v. Commissioner,551 F.2d 929 (3rd Cir. 1977), revg. in part a Memorandum Opinion of this Court. See also Sullivan v. United States,618 F.2d 1001 (3rd Cir. 1980). In Demkowicz the issue was whether the petitioner had diverted corporate funds to his own use and thus received a dividend. The petitioner denied diversion of the moneys and the respondent introduced no evidence. The Third Circuit discussed the usual presumption of correctness of deficiency determinations and stated that once the taxpayer presents credible evidence sufficient to establish that the deficiency determination was erroneous the Commissioner has the burden of going forward with the evidence. The taxpayer's uncorroborated but unequivocal denial of receipt of the funds was found to be sufficient unless such testimony was "improbable, unreasonable or *682 questionable." 551 F.2d at 931. Because the present issue largely rests upon our assessment of the various witnesses', including Stratmore's, credibility, we do not see how Demkowicz will aid us in our endeavor. Rider/General and Stratmore also contend that because respondent has determined additions to tax or fraud based on cash interest payments and respondent bears the burden of proof as to the issues of fraud pursuant to section 7454(a), then respondent must also prove that cash interest payments were not made. We disagree insofar as the underlying deficiency is concerned. Compare p. 81, infra.Respondent has determined substantial understatements in the incomes of Stratmore and Rider/General. The burden of disproving the deficiencies is on the petitioner. Stone v. Commissioner,56 T.C. 213, 224 (1971). Rider/General and Stratmore maintain that cash interest was paid to Howald of $ 10,237 and $ 30,500 during Rider/General's taxable years 1966 and 1967, respectively. Howald contends that he received no interest payments from Rider/General in excess of the amount reported on his 1966 return. During 1966, three Rider/General checks (numbers 3980, 3981, and 3982) totalling *683 $ 2,500, payable to Howald Factoring, were endorsed by Howald. Each of these checks bore a December 1966 date and was cashed in December 1966. During 1967, fourteen Rider/General checks (numbers 4509, 4510, 4512, 4513, 4514, 5394, 5395, 5396, 5397, 5398, 5919, 5920, 5921, and 5922), totalling $ 7,000 and payable to Howald Factoring, were endorsed by Howald. The dates on these checks start from March 3, 1967 and proceed through June 9, 1967, each check being dated one week later than the preceding check, except that no check for April 7, 1967 was produced. Thus, during Rider/General's 1966 taxable year, no checks were endorsed by Howald and during Rider/General's 1967 taxable year checks totalling $ 9,500 were endorsed by Howald ($ 2,500 in 1966 and $ 7,000 in 1967). During 1966, eight checks of Rider/General (numbers 1506, 1844, 1847, 2378, 2932, 3438, 3758 and 3828), totalling $ 3,304.09 and payable to Howald Factoring, were endorsed by Kay, Vice-President at Howald's bank. Of these eight checks, five checks were dated prior to November 1, 1966: #1506 (June 1, 1966), #1844 (July 1, 1966), #1847 (July 29, 1966), #2378 (September 1, 1966) and #2932 (October 3, 1966). The total *684 of the five checks issued during Rider/General's taxable year 1966 is $ 2,076.07. The remaining three checks, #3438 (November 1, 1966), #3758 (November 15, 1966) and #3828 (December 2, 1966), were issued during Rider/General's taxable year 1967 and total $ 1,228.02. During 1967, seven checks of Rider/General (numbers 4277, 4515, 4933, 5548, 5989, 6357 and 0158), totalling $ 3,050.58 and payable to Howald Factoring were endorsed by Kay. All seven checks bore dates falling within Rider/General's taxable year 1967, i.e. from January 3, 1967 through August 3, 1967. One check was issued for each of the first 8 months of 1967 (except July) and none of the checks is dated later than the 4th of a month. Check number 0158, in the amount of $ 2,028.76, was recorded by Rider/General as including $ 500 of interest and $ 1,175.61 of principal. The discrepancy between the amount of the check ($ 2,208.76) and the sum of interest and principal for the check per Rider/General's records ($ 1,675.61), or $ 353.15, is not explained by this record. The total of these seven checks, including only $ 500 of check number 0158, is $ 1,521.82. Thus, Rider/General checks totalling $ 2,749.84, ($ 1,228.02 *685 plus $ 1,521.82) payable to Howald Factoring and endorsed by Kay, were issued during Rider/General's taxable year 1967. While Howald contends that he did not receive the checks endorsed by Kay because Kay had no authority to sign on Howald Factoring's account, we have been offered no explanation why checks made payable to Howald Factoring and endorsed for deposit to Howald Factoring's account should not be found to have been actually deposited in that account. Therefore, we find that Howald received the proceeds of each Rider/General check issued to Howald Factoring, regardless of whether the check was endorsed by Howald or by Kay. The following schedule represents the sum of, the endorser of and the taxable year of Rider/General checks payable to Howald Factoring (determined by including only $ 500 of check 0158): Taxable Year
Taxable Year
Calendar
Calendar
Ended
Ended
Year
Year
October 31, 1966
October 31, 1967
1966
1967
Checks endorsed by
Howald
$ 9,500.00
$ 2,500.00
$ 7,000.00
Checks endorsed by
Kay
$ 2,076.07
2,749.84
3,304.09
1,521.82
Total
$ 2,076.07
$ 12,249.84
$ 5,804.09
$ 8,521.82
The remainder of the amounts in dispute among Rider/General, Stratmore and Howald results from numerous Rider/General *686 checks which Stratmore cashed at Prospect Park with Kay's approval. Stratmore's testimony regarding these checks directly conflicts with Kay's, while Howald's testimony is rather uncertain. Stratmore testified that Kay implied to him that Howald made loans to Rider/General on behalf of Howald Factoring and Cedar Knolls Enterprises. These loans were not made directly from Howald to Stratmore, these parties being barely acquainted with each other, but were made through Kay, a close friend of Howald's and an officer at Howald's bank. When Stratmore received cash loans from Kay he would pay the interest on such loans in cash, at Kay's demand. The cash paid by Stratmore came from Rider/General checks which Kay approved to be cashed at Prospect Park. Stratmore would leave the endorsed checks with Kay and did not know what Kay did with the proceeds. Stratmore denies retaining any money from these checks.Stratmore claims that Kay arranged loans to Rider/General from several persons, including Howald. Kay testified that he was involved with loans from Howald to Rider/General, including the $ 25,000 loan secured by the chattel mortgage on Rider/General's machinery. Prospect Park did *687 not consider Rider/General to be an acceptable client to loan funds to directly. Howald was a close friend of Kay and relied heavily on Kay's advice and assistance. Kay approved Rider/General checks for cashing by Stratmore but insists that Stratmore kept the cash. Kay denies that Stratmore ever gave him large amounts of cash or that he demanded cash interest payments from Stratmore, although on a few occasions Kay received $ 200 or so from Stratmore to give to Howald. Kay claims that Stratmore needed the cash to obtain government contracts. Howald testified that he met Stratmore once or twice and made a loan to Rider/General with a hope of obtaining its machine shop. Howald denies ever receiving a check or cash from Stratmore, either directly or through Kay. Howald doesn't remember the interest rates of the loans from Prospect Park to him and from him to Rider/General. Howald visited Prospect Park twice a week to sign various papers for Kay but they did not discuss Howald's loan accounts with Prospect Park. Howald does not know if Kay turned over all the proceeds from Rider/General or not. Howald was unaware of the Rider/General checks which Stratmore cashed. The determination *688 of who received the check proceeds is essentially one of credibility. While the interval between the transactions in issue and the trial herein is a lengthy one, perhaps explaining some of the witnesses' memory lapses, we find, based on the entire record, that Stratmore did not retain the cash but left it with Kay. We reach this conclusion for a number of reasons which, when considered together, convince us that Stratmore did not keep the money in question. It is not disputed that Kay approved numberous Rider/General checks for cashing at Prospect Park. The amounts obtained from the checks were indeed substantial, $ 22,693.27 and $ 16,543.66 during 1966 and 1967, respectively. Even though Stratmore had been requested to close his accounts at Prospect Park and Rider/General was considered a poor credit risk by Prospect Park, Kay allowed Stratmore to cash checks totalling over $ 39,000 during 1966 and 1967. Kay's approval of these checks is illogical if one accepts Kay's testimony that Stratmore kept all of the check proceeds. Another puzzling question is why Stratmore chose to negotiate the checks at Prospect Park, where he was personanongrata, rather than Rider/General's bank, *689 if he intended to keep the money for himself.Rider/General's bank was located in Clifton, the same city where Rider/General's offices were located, while Prospect Park was located 6 to 8 miles from Rider/General's offices and was a minimum of 30 minutes away by automobile. Arguably, Stratmore could have selected Prospect Park in anticipation of providing an explanation for the checks, but then one asks what purpose would Kay have for cashing Rider/General's checks? Additionally, an interesting pattern develops when one compares the Rider/General checks payable to Howald Factoring which were endorsed by Kay with a number of the Rider/General checks cashed by Stratmore with Kay's approval. Almost without exception, a check to Howald Factoring and endorsed by Kay may be linked with a check cashed for nearly or exactly twice the amount. The following chart demonstrates this pattern: Date of Check
Number
Disposition
Amount
June 1, 1966
1506
Deposited
$ 362.92
June 1, 1966
1505
Cashed
725.83
July 1, 1966
1844
Deposited
360.48
July 1, 1966
1865
Cashed
720.98
July 29, 1966
1847
Deposited
403.70
July 29, 1966
2093
Cashed
807.42
September 1, 1966
2378
Deposited
533.84
September 1, 1966
2649
Cashed
1,067.73
October 3, 1966
2932
Deposited
415.13
October 3, 1966
2582
Cashed
830.27
November 1, 1966
3438
Deposited
393.16
November 1, 1966
3426
Cashed
786.32
December 2, 1966
3828
Deposited
334.86
December 2, 1966
3827
Cashed
669.72
January 3, 1967
4277
Deposited
156.50
January 3, 1967
4164
Cashed
313.00
February 1, 1967
4515
Deposited
207.76
February 2, 1967
4384
Cashed
415.52
March 3, 1967
4933
Deposited
142.71
March 3, 1967
5081
Cashed
285.42
April 4, 1967
5548
Deposited
267.45
April 4, 1967
4891
Cashed
534.88
May 2, 1967
5989
Deposited
174.07
May 2, 1967
6172
Cashed
348.16
June 5, 1967
6357
Deposited
73.33
June 2, 1967
6527
Cashed
146.68
*690 We cannot divine any purpose from this pattern except for the payment of cash by Rider/General to persons other than Stratmore. Further, it appears that Kay provided Stratmore with lenders other than Howald during 1966 and 1967. One such person would be Garrett Roosma. Rider/General, Stratmore and respondent stipulated that $ 400 and $ 100 were paid to Roosma during Rider/General's taxable years 1966 and 1967, respectively. However, Rider/General check number 5010, dated March 1, 1967 in the amount of $ 1,000 was, contrary to the parties' stipulation, not cashed by Stratmore at Prospect Park but was deposited in Roosma's account. Lastly, Kay denied receiving substantial gifts from Stratmore, including a stereo, an aerial for a color television (including a service contract) and a Frigidaire household refrigerator. When confronted with the receipts for such items, Kay claimed to have purchased those items through Stratmore. Stratmore denied being reimbursed by Kay. Based on the foregoing, we find Rider/General is entitled to deduct the following amounts: Checks Payable
Checks Cashed
to
by
Taxable Year Ended
Howald Factoring *
Stratmore **
Total
October 31, 1966
$ 2,076.07
$ 10,237.23
$ 12,313.30
October 31, 1967
12,249.84
28,999.70
41,249.54
*691 We have also found that Rider/General paid Roosma $ 1,000 during the taxable year 1967 and is entitled to an interest deduction for that amount. However, check number 0159 for $ 500, dated August 3, 1967, which was negotiated by the Stratmores at the Franklin Bank does not appear to have been paid over to a lender and thus Rider/General is not entitled to deduct that sum. Respondent determined that Howald received unreported interest from Rider/General of $ 26,820.37 and $ 26,565.48 during 1966 and 1967, respectively, as follows: 1966
1967
Checks Paid Directly to Howald
$ 5,804.09 $ 8,521.82
Checks Cashed by Stratmore
and Given to Howald
22,693.27 18,043.66
Total Received
$ 28,497.36 $ 26,565.48
Amount Reported on Return
(1,676.99)
Unreported Interest Income
$ 26,820.37 $ 26,565.48
We have already found that Howald received each Rider/General check made out to the Howald Factoring account, whether endorsed by Howald or by Kay. As detailed above Stratmore cashed checks, with *692 Kay's approval, totalling $ 22,693.27 and $ 16,543.66 during 1966 and 1967, respectively. We have found that Stratmore did not retain these amounts, but left them with Kay. Respondent contends that Kay gave the cash he received to Howald as interest. Howald argues that he never received cash interest from Stratmore, that Howald's loans to Stratmore terminated in mid-1966 when Roosma took over the loans, and that Kay may have used Howald's account at Prospect Park to make loans on behalf of other individuals. Before making this determination we emphasize, as was made clear at trial, that we have not considered the facts stipulated to by Rider/General, Stratmore and respondent to be binding as to Howald. The record shows that rather than Roosma taking over Howald's $ 35,000 loan to Rider/General, Howald paid Roosma $ 35,000 and replaced Roosma on the loan. Howald bases his contention on four exhibits which were shown to Stratmore on cross-examination by counsel for Howald. First, Stratmore was requested to look at Exhibit 30-EE, a joint exhibit of Rider/General, Stratmore and respondent, which was a Rider/General loan card for Howald. Stratmore could not ascertain whether the *693 notation "(exch. G.R. orig. 11/29/66 due on dem. 35000--)" on this exhibit meant that Roosma replaced Howald on the $ 35,000 loan. Stratmore then was asked to scrutinize three of Howald's exhibits, Exhibits 38, 39 and 40. Exhibit 38 is a letter dated July 7, 1966 from Kay to Roosma which states: This is to advise you that I am holding for you stock [of the Pantasote Company] registered in n/o John Howald. Total shares 60,840. I am to hold these certificates until you are paid $ 25,000 advanced to General Manufacturing by you this date. (s) Roy Kay, Jr. Exhibit 39 is a 60-day promissory note, dated October 18, 1966, from General Manufacturing to Garrett Roosma, Jr. in the principal sum of $ 25,000. Stratmore testified that Exhibits 38 and 39 may support Howald's contention. Counsel for Howald then showed Stratmore Exhibit 40, a Rider/General loan card for Roosma and the following colloquy occurred: Q. Mr. Stratmore, I give you Exhibit P-40 for identification, which is a ledger card taken from General Manufacturing's records, which is marked Garrett Roosma, and it begins in 1967. Do you recognize it?
A. You're right, Mr. Howald --Mr. Zuckerman, what you were trying to prove *694 before. I see a memorandum here on our records.Transferred to Howald direct check from Howald to G.R. Q. So that-- A. So apparently that must have some connection. That's why I brought it out. Q. So beginning in late 1966 and continuing on through 1967, Mr. Roosma took over, at least so Mr. Kay had advised you, or so your bookkeeper was made aware. Mr. Roosma became the lender of monies-- A. Yes, I would say -- Q. -- in substitution for Mr. Howald? A. I wouldn't say in substitution, but he became a lender of money. On redirect examination, Stratmore again scrutinized Exhibits 30-EE and 40 and stated that those records indicate that Howald took over the loan from Roosma and not the converse. Exhibit 40, Roosma's loan card, shows a balance forward as of November 29, 1966 of $ 35,000. After six payments on principal are recorded, reducing the loan balance to $ 32,914.71, the following notations appear: Memo
Date
Reference
Debit
Credit
Balance
trans to Howald
3/3/67
CR
30,000
(direct check from
Howald to GR)
trans to Howald
3/14/67
CR
5,000
(2085.29)
(direct check from
Howald to GR)
transfer Payments
3/14/67
2085.29
to Howald note
date 3/3/67 -
29,499.87 The second page of Exhibit 40 contains the *695 following notation, "Note Paid off to GR Roosma by Howald, 3/3/67 - 30,000. 3/14/67 - 5,000. all payments Trans to Howald ledger." Exhibit 30-EE, Howald's loan card, states, in part: Memo
Date
Reference
Debit
Credit
Balance
(replace GR note
3/3/67
CR
30,000
30,000
orig. 11/29/66 -
35m. direct ck.
Howald to GR
bal to GR re
3/14/67
CR
5,000
35,000
note above
trans. payments
3/14/67
2085.29
32,914.71
from GR Note
11/29/66 now due
to Howald (Jan.
Payment)
Thus, while Stratmore was unsure whether Roosma replaced Howald on the loan, it is otherwise clear from the record that Howald replaced Roosma on this particular loan. Therefore, Howald's contention that all of his loans to Rider/General were paid by mid-1966 is inaccurate. It is clear that Howald had at least one loan outstanding to Rider/General during 1967. While the record is otherwise extremely difficult to evaluate, we find that Howald has not shown that he did not receive cash interest from Stratmore, through Kay, during 1966 and 1967. We have already found that Kay received $ 22,693.27 and $ 16,543.66 from Stratmore during 1966 and 1967, respectively. Kay indicated to Stratmore that the cash was due to Howald; Stratmore never paid Howald directly. *696 Kay arranged numerous loans to Rider/General from a number of individuals, including Roosma and Howald. During 1967 Howald had at least one loan outstanding to Rider/General. Furthermore, the unusual pattern, described supra, of checks to Howald Factoring and cash is a strong indication that Kay was receiving cash payments. In addition, Kay and Howald were very close friends. We cannot, however, ascribe to Howald the full amounts paid to Kay. We think that other persons also received some of the cash. Roosma received at least $ 1,000 from a check which Stratmore thought Kay gave to Howald. Kay's entire role in this matter demonstrated some rather unusual banking practices as to former customers (Rider/General and Stratmore) which had been requested to remove their accounts from Kay's bank. We find that $ 4,000 and $ 5,000 was received by others during 1966 and 1967, respectively. Accordingly, we find that Howald must include in income the remainder, i.e., $ 18,693.27 and $ 11,543.66, during 1966 and 1967, respectively. Howald maintains that if we find that he received amounts from Rider/General in excess of those reported, then such amounts were received as payments of principal *697 and not interest. In New Jersey the general rule is that payments by a debtor "should be applied to the satisfaction of interest due and only then to the principal, if any of the payment be available." Darr v. Kervick,31 N.J. 476, 158 A.2d 42, 48 (1960).The debtor and creditor can agree, however, to apply payments to principal and then to interest, State v. Erie R.Co.,23 N.J. Misc. 203, 42 A.2d 759, 763 (Supreme Ct. 1945); Appelget v. Van Hise,44 N.J. Super 507, 131 A.2d 20, 31 (Superior Ct. 1957). Howald introduced no evidence which would show that amounts received from Rider/General were intended to be payments of principal and not interest. Accordingly, Howald must include the following amounts in income during 1966 and 1967: 1966
1967
Checks Paid Directly to
$ 5,804.09 $ 8,521.82
Howald
Cash
18,693.27 11,543.66
Subtotal
24,497.36 20,065.48
Amount Reported on
Return
(1,676.99)
Unreported Interest
Income
$ 22,820.37 $ 20,065.48 In addition to payments to Howald, Rider/General claims the following cash interest payments were made: Taxable Year Ended
Taxable Year Ended
October 31, 1966
October 31, 1967
John Welsh
$ 6,200
$ 2,475
Charles Roosma
2,400
2,363
Esther Stratmore
1,012
1,000
Garrett Roosma
400
100
J. Feder
500
250
L.M.
400
John Pizzuto
12,450
7,743
Cedar Knolls Enterprises
3,463
2,000
Louis Junquera
22,820
22,069
Unallocated
10,778
Total
$ 60,423
$ 38,000
Junquera *698 has conceded receipt of the entire amount claimed by Rider/General and, in accordance with respondent's concession, Rider/General will be allowed a deduction for those sums and Stratmore will not be required to include them in income. Pizzuto conceded receipt of $ 5,433 and $ 2,050 during 1966 and 1967, respectively. The remainder of the claimed cash interest payments to Pizzuto is still in issue. We find that the record shows that Rider/General did indeed pay those additional amounts to Pizzuto. The remainder of the interest payments were disputed by respondent based on an alleged scheme to divert funds from Rider/General to Stratmore, which Stratmore denied. We have found Stratmore to be entirely candid and forthright and see no reason to discount his testimony. While Stratmore could not precisely recall the indentities of each lender involved, the crucial events transpired a dozen years or more before the trial herein and Stratmore's inability to recount them in detail cannot be held strictly against him. We note, in passing, that none of the other testimony presented were models of clarity. Thus, we hold that with the exception of check number 0159, dated August 5, 1967, *699 for $ 500, described supra,Rider/General is entitled to deduct the entire amount claimed, i.e. $ 70,660 and $ 68,000 for its taxable years 1966 and 1967. Consequently, Stratmore is held to have received $ 500 from Rider/General during 1967 which must be taxable as a dividend. Issue (2)
FACTS On its tax returns for the taxable years 1966 and 1967, Rider/General deducted as interest the following "loans discounted and repaid": Taxable Year 1966
Taxable Year 1967
Esther Stratmore
$ 8,000
Benjamin Stratmore
400
$ 100
Total
$ 8,400
$ 100
These amounts were included in the total of the disputed interest payments asserted by respondent to be taxed to Benjamin and Helen Stratmore as dividends. Marvin Bass, comptroller of Rider/General, could not identify what "loans discounted and repaid" represented.Rider/General and Stratmore introduced no other evidence concerning that item and the record was left open for a supplemental stipulation regarding it. At trial, respondent, due to the lack of evidence in his files, conceded that these amounts were not dividends to the Stratmores unless the record could be further developed. [15] No supplemental stipulation was received relevant to loans discounted and *700 repaid nor did any facts otherwise come into the record on this issue. OPINION Rider/General deducted $ 8,400 and $ 100 as interest on loans discounted and repaid during its taxable years 1966 and 1967, respectively. Respondent disallowed these deductions and determined that Stratmore had dividend income of $ 8,400 and $ 100 during 1966 and 1967, respectively. No additional evidence was presented on this issue by the parties. Due to respondent's concession, we find such loans do not constitute income to Stratmore. Issues (3) and (4)
FACTS Both of these issues turn upon whether certain payments made by Rider/General to Stratmore which were deducted by Rider/General as travel and entertainment expense are deductible as additional compensation paid to Stratmore. One of the consequences of the 1958 bankruptcy reorganizations of Rider and General was the *701 placement of limitations on the maximum salaries the corporations could pay to Stratmore and Helen Stratmore. The record does not disclose the amounts of the limitations so agreed to. The Stratmores also agreed to make payments to various lenders for the portion of the corporate debts remaining unpaid after the bankruptcy reorganizations. Rider/General paid the following salary and "travel and entertainment" expenses to Stratmore: Taxable Year Ended
Salary
"Travel & Entertainment"
October 31, 1961
$ 8,160.00
* $ 59,615.76
October 31, 1964
8,300.00
70,103.82
October 31, 1965
8,180.00 ** 52,316.39
October 31, 1966
10,820.00
67,843.20
October 31, 1967
41,818.44
17,365.32
The amounts paid as travel and entertainment expenses were deducted as such by Rider/General. However, these amounts were actually not intended for travel and entertainment purposes. The amounts paid during Rider/General's taxable *702 years 1966 and 1967 were intended to provide Stratmore with sufficient funds to meet his obligations incurred in the Chapter XI proceedings.Rider/General did not include the travel and entertainment payments made during its taxable years 1966 and 1967 in Stratmore's Forms W-2 and did not issue Forms 1099 for those years' payments. On their joint returns for the years 1961, 1964, 1965, 1966 and 1967 the Stratmores reported the following amounts of salary and "additional compensation" for Stratmore and deducted the following payments on their guarantees: Additional
Payments on
Year
Salary
Compensation
Total
Guarantees
1961
$ 8,250
$ 62,701.27
$ 70,951.27
$ 28,214.40
1964
* not clear
72,461.63
34,141.53
1965
8,250
44,632.75
52,882.75
27,350.00
1966
12,450
60,197.48
72,647.48
42,975.00
1967
17,500
49,838.49
67,336.49
20,941.32
As President and Chief Financial Officer of Rider/General Stratmore performed substantial duties. Stratmore's principal function was obtaining the necessary capital to keep Rider/General alive. Stratmore also played an important role in obtaining new business for Rider/General. *703 On its returns for the taxable years 1966 and 1967 Rider/General deducted $ 67,843.20 and $ 17,365.32, respectively, as travel and entertainment expense.On the notice of deficiency respondent disallowed these amounts in full with the explanation for each year that "it has not been established that such amount represents an ordinary and necessary business expense or was expended for the purpose designated." On its returns for the taxable years 1966 and 1967 Rider/General claimed net operating loss deductions of $ 139,383.70 and $ 92,452.08, respectively.In the notice of deficiency respondent disallowed $ 121,873.47 of the claimed net operating loss deduction for the taxable year 1966 and the entire claimed net operating loss deduction for the taxable year 1967. The claimed net operating loss deductions result from prior taxable years of Rider/General. The parties having settled certain of the adjustments to the prior years the only disputed amounts are the travel and entertainment payment to Stratmore for the taxable years 1961, 1964 and 1965. OPINION Respondent and Rider/General have addressed the deductibility of amounts paid to Stratmore as travel and entertainment expense in *704 different manners. Rider/General contends that these payments involve the issue of whether Stratmore's total compensation, including the amounts paid him as travel and entertainment, was reasonable. Respondent maintains that the amounts paid Stratmore as travel and entertainment were not compensation and hence are not deductible. Respondent urges that the payments were made to provide money for Stratmore's guarantees and are thus dividends. Respondent does not argue that should we find the disputed payments to be compensation then such compensation was not reasonable in amount. Section 162(a) allows as a deduction, interalia, "a reasonable allowance for salaries or other compensation for personal services actually rendered." The test of deductibility of compensation payments is whether the payments are reasonable and are in fact payments purely for services, section 1.162-7(a), Income Tax Regs. We have described this test as being "two-pronged", Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. 496 F.2d 876 (5th Cir. 1974). Due to the respondent's position was need only to determine whether the payments were compensatory for if they were their reasonableness *705 has been conceded. It is well settled that only if payment is made with the intent to compensate is the payment deductible as compensation, Paula Construction Co. v. Commissioner,58 T.C. 1055, 1058 (1972), affd. 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,supra at 1340. See also Rapid Electric Inc. v. Commissioner,61 T.C. 232, 241 (1973); Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962); and J.J. Kirk, Inc. v. Commissioner,34 T.C. 130, 139 (1960), affd. 289 F.2d 935 (6th Cir. 1961). Whether such intent has been shown is a factual question to be decided upon the basis of the particular facts and circumstances of the case, Paula Construction Co. v. Commissioner,supra at 1059; Electric & Neon, Inc. v. Commissioner,supra at 1340. Rider/General has the burden of proving that the payments to Stratmore were compensatory, Rule 142(a), Tax Court Rules of Practice and Procedure. The only evidence adduced at trial regarding these payments, other than evidence relevant to whether the amounts were reasonable, was the testimony of Rider/General's comptroller, Marvin Bass, concerning the payments made during the taxable years 1966 and 1967. *706 Bass testified, and Rider/General concedes, that the payments made during those taxable years were made to provide Stratmore with enough money to pay on his personal guarantees. [16] Thus personal obligations of Stratmore necessitated Rider/General's payment of these amounts and they do not appear to be intended as compensation. In other words, had it not been for Stratmore's personal guarantees the disputed payments would not have been made. Accordingly, such payments are not deductible by Rider/General. Rider/General contends that the payments could not be constructive dividends, and therefore must be compensation, because the corporation operated at a loss and because they were not made pro rata to shareholders. Section 316 defines a dividend as a distribution of property made by a corporation to its shareholders out of current and accumulated earnings and profits. Generally speaking, corporate distributions may be taxed to shareholders under *707 section 301 as dividends (section 301(c)(1)), return of capital (section 301(c)(2)) or as gain from the sale of stock (section 301(c)(3)). The fact that a distribution to a shareholder/employee may not be a dividend does not make it any less a distribution and thus nondeductible. Furthermore, there is no requirement that constructive dividends be made pro rata, Commissioner v. Riss,374 F.2d 161, 167 (8th Cir. 1967), affg. in part, revg. and remanding in part a Memorandum Opinion of this Court. Issue (5)
FACTS As described previously, Rider and General undertook bankruptcy reorganizations in the late 1950's. Prior to this time the Stratmores had guaranteed numerous corporate obligations and lent their endorsement to the corporations. Rider and General paid their creditors only 25 cents for each dollar owed. In order to accomplish the reorganization the Stratmores agreed to forego their claims as creditors of the corporation and to honor their obligation as guarantors of the remaining 75 percent of the corporate debts. General was originally capitalized with $ 50,000 borrowed from Rider which Rider had obtained through another loan based on the Stratmores' guarantee.During its *708 taxable years ended October 31, 1961 through October 31, 1970 General's common stock issued and outstanding was $ 50,000. During 1961 through 1971 and 1973 the Stratmores received the following salaries from Rider/General: Year
Ben Stratmore
Helen Stratmore
Total
1961
$ 8,250
$ 5,500
$ 13,750
1962
8,250
5,500
13,750
1963
8,250
5,500
13,750
1964
*
*
14,000
1965
8,250
5,500
13,750
1966
12,450
8,300
20,750
1967
17,500
11,400
28,900
1968
22,000
12,000
34,000
1969
27,875
13,500
41,375
1970
33,060
13,250
46,310
1971
85,440
20,050
105,490
1973
130,980
18,550
149,530 During the years 1961 through 1971 the Stratmores made payments as guarantors of the obligations of Rider and General as follows: Year
Amount
1961
$ 34,486.87
1962
45,014.42
1963
17,240.00
1964
* *709 34,141.53
1965
27,350.00
1966
42,975.00
1967
20,941.32
1968
47,816.94
1969
23,185.66
1970
13,857.33
1971
1,000.00
1973
1,000.00
The Stratmores claimed the amounts paid as guarantors as ordinary deductions on their returns for the years 1961 through 1971 and 1973. During the years 1961 through 1971 Stratmore received Rider/General checks payable to him which were charged on the corporate books and claimed on the corporate returns as travel and entertainment expense. Stratmore reported these payments as income in several manners. For the years 1961, 1962, and 1971 and excess of the corporate payments over certain travel and entertainment expenses plus the guarantor payments was included in his income as "expense allowance." For the years 1963, 1964 and 1965 the excess of the corporate payments was included in his income as "expense allowance" after deductions for travel and entertainment were taken. The guarantor payments were claimed as other deductions. For 1966 and 1967 the corporate payments were reported as "additional compensation expense allowance" and the guarantor payments were claimed as miscellaneous deductions. No deductions were claimed for travel and entertainment. For 1968 the total of the guarantor payments plus travel and entertainment expenses exceeded the total of the corporate *710 payments. This excess was deducted as employee business expense. For 1969 and 1970 the corporate payments were added to the Stratmores' salary income and were described as additional compensation. The guarantor payments were deducted as employee business expenses. A similar issue involving the Stratmores and similar loan guarantees was the subject of a tax refund suit between the Stratmores and the United States involving the taxable year 1959, Stratmore v. United States,420 F.2d 461 (3rd Cir. 1970). [17]
In the notice of deficiency dated June 28, 1974, respondent determined that the guarantor payments were deductible as nonbusiness bad debts under section 166(d) allowable as short-term capital losses subject to the limitations of section 1211(b). The Stratmores *711 argue that their payments on the agreements entered into before the Chapter XI proceedings gave rise to business bad debts, fully deductible against ordinary income under section 166(a). [18] Respondent contends that such payments were nonbusiness bad debts, deductible only as short-term capital losses, pursuant to section 166(d), subject to the limitations of section 1211(b). [19] *712 *713 There is no dispute that the agreements placed the Stratmores in the position of guarantors [20] nor that the debts became worthless in the years claimed. The only dispute is whether these debts were business or nonbusiness debts. Section 166(d)(2) defines nonbusiness debts as debts other than debts created or acquired in connection with the trade or business of the taxpayer or a debt the loss from which the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt *714 is a nonbusiness debt is a question of fact, with the burden of proof on the petitioner, the determination of which depends upon whether the debt is proximately related to the taxpayer's trade or business, section 1.166-5(b)(2), Income Tax Regs.; Smith v. Commissioner,55 T.C. 260, 267 (1970), remanded for consideration in light of United States v. Generes,405 U.S. 93 (1972), at 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). Stratmore contends that the debts were incurred in his trade or business of being an employee of Rider/General. Respondent asserts that the debts were incurred to protect Stratmores' investment. It is clear that an employee may establish the requisite business nexus for the deductibility of a worthless debt under section 166(a), Trent v. Commissioner,291 F.2d 669 (2nd Cir. 1961). The difficulty arises where the taxpayer is a shareholder of a corporation as well as its employee. In that instance the debt incurred by the taxpayer may be motivated by both employment and investment considerations of the taxpayer and both motivations may be significant. The Supreme Court recognized the problems attendant where a taxpayer has a dual status *715 with respect to the debtor in United States v. Generes,405 U.S. 93 (1972). The Court held that in determining whether a bad debt has a proximate relation to a taxpayer's trade or business the test is the taxpayer's dominant motive in incurring the debt, supra at 103. A threshhold determination to be made is whether the taxpayer's motivation must be analyzed at the times the guarantee agreements were made or at the times when payments were made thereupon. The Stratmores contend that we must look to the times of the payments on their guarantees while respondent asserts that we must look to the times the guarantees were made. We agree with respondent. While the statute and regulations do not tell us the point in time to look for the proximate relation, and hence the dominant motivation, in a guarantee context, the courts have held that the proper time-frame is when the taxpayer entered into the guarantee agreements. See United States v. Generes,supra at 100-101; Niblock v. Commissioner,417 F.2d 1185, 1187-1188 (7th Cir. 1969). [21] *716 The Stratmores attempt to distinguish Generes as involving loans rather than payments on guarantees. They had misread Generes, for in that case, involving losses both as lenders and indemnitors, the taxpayers reported the loss from loans as nonbusiness bad debts. The issue in Generes was the nature of the deduction from the indemnification loss. Thus, the proper time to determine the Stratmores' motivation is when the agreements were made. [22]
We find that the Stratmores did not have the dominant motivation of protecting their employee status at the times the guarantees were made. The guarantees were entered into prior to the Chapter XI proceedings of Rider and General. Concurrent with these guarantees was an agreement by the Stratmores to limit their salaries from the corporations. The amounts of these salaries, which consist of pre-tax dollars, are not in evidence.[23] *717 The Stratmores contend that because they had little or no investment to protect, their dominant motivation in making the guarantees must have been employment related. We disagree. While General was capitalized with $ 50,000 borrowed from Rider, Rider was capitalized with $ 15,000 paid by Stratmore and his two brothers. Additionally, the value of Rider/General's machine stop was approximately $ 500,000. There has been no showing that Stratmore would have otherwise been unable to obtain employment. The Stratmores have not shown the extent of their capital investment in Rider/General. While the circumstances surrounding the executions of the guarantees imply some rather shaky corporate balance sheets, we cannot, on this scant record, hold that the Stratmores' dominant motive in executing such guarantees was the protection of their jobs. Accordingly, we hold that the payments made as guarantors are deductible as nonbusiness bad debts. Issue (6)
FACTS During the years 1966 through *718 1971 the Stratmores, in addition to the principal amounts paid on their guarantees, paid interest on such guarantees. The Stratmores claimed these amounts as interest deductions on their returns as follows: Year
Amount
1966
$ 742.84
1967
387.50
1968
691.55
1969
19,536.67
1970
25,644.67
1971
15,644.67
Respondent disallowed these interest deductions and determined that the payments were nonbusiness bad debts deductible as short-term capital losses. OPINION Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. The general rule is that an interest payment may not be deducted unless the interest is owed on an indebtedness of the one seeking the deduction. [24] Payment of interest made by one who is secondarily liable on the debt does not not entitle the payor to a deduction. Nelson v. Commissioner,281 F.2d 1, 5 (5th Cir. 1960); Abdalla v. Commissioner,69 T.C. 697, 707 (1978), affd. 647 F.2d 487 (5th Cir. 1981); Rushing v. Commissioner,58 T.C. 996, 1000 (1972). As we stated in Eskimo Pie Corp. v. Cimmissioner,4 T.C. 669, 675 (1945), affd. per curiam 153 F.2d 301 (3rd Cir. 1946), "The statutory deduction for interest is confined to amounts chargeable *719 against the taxpayer on his own indebtedness, and he may not deduct interest on the indebtedness of another, even though he has by legal contract agreed to pay such interest (citations omitted)." The Stratmores paid interest on their obligations as guarantors, which obligations were absolute. It is well settled that the indebtedness which gave rise to such interest was that of the primary obligor, i.e. Rider and General, and not that of the guarantor. Therefore, taxpayer-guarantors have long been denied interest deductions under section 163, Nelson v. Commissioner,supra;Abaalla v. Commissioner,supra; Rushing v. Commissioner,supra;Eskimo Pie Corp. v. Commissioner,supra.[25] *720 Accordingly we must sustain respondent's determination on this issue. Issue (7)
FACTS After the termination of the bankruptcy reorganizations Stratmore continued in his role of financing Rider and General. Stratmore was, until approximately 1977, the only corporate officer or employee involved in the financial affairs of the corporations and, subsequently, the merged corporation. Stratmore's efforts in this area were instrumental in keeping Rider/General alive. During the 1960's approximately 90 percent of Rider/General's business was done with the Federal government. During this time, the vast majority of the work with regard to obtaining government contracts was done by Stratmore. Stratmore was responsible for communicating with the Federal government and determining what contracts for aircraft engine components were available for Rider/General to bid upon. Stratmore and his brother, Bill, worked together to determine the amount of the bid which Rider/General submitted. Stratmore also visited various Air Force depots throughout the United States on a more or less regular basis to receive contracts. Some time around 1970 Rider/General began to do more business with private corporations. These *721 corporations would send their blueprints to Rider/General which then proposed a bid for the contract. Stratmore checked on the corporation's credit and gave the corporation Rider/General's terms. Stratmore also did follow-up work in the collections for Rider/General. The following is a table of Rider/General's gross sales (after allowances and returns), Stratmore's salary from Rider/General, Stratmore's salary as a percent of Rider/General's gross sales, Rider/General's taxable income per its returns, Rider/General's Federal income tax paid and Rider/General's earned surplus and undivided profits per its returns for the taxable years 1961-1970 and 1974: [26]
Salary/Gross
FYE
Gross * *722 October 31
Sales
Salary **
Sales
1961
$ 1,505,748
$ 8,160
0.54%
1962
1,937,553
8,300
0.43%
1963
1,623,886
8,290
0.51%
1964
1,675,170
8,300
0.50%
1965
2,000,634
8,180
0.41%
1966
1,895,124
10,820
0.57%
1967
2,256,167
41,818
1.85%
1968
1,772,609
58,466
3.30%
1969
1,676,042
70,591
4.21%
1970
1,391,775
72,384
5.20%
1974
1,958,731
166,365
8.49%
Earned
Surplus and
FYE
Income ***
Unidivided
October 31
Taxable
Tax
Profits
1961
$ (108,338)
$ (1,101,778)
1962
48,319 (1,053,459)
1963
43,089 (1,003,259)
1964
(9,941)
(1,014,173)
1965
(21,104)
(1,036,758)
1966
(61,407)
(1,096,784)
1967
183,977 $ 25,574
(938,381)
1968
213,898 103,684
(604,638)
1969
232,719 114,787
(486,706)
1970
155,760 71,098
(412,022)
1974
(21,345)
(754,684)
Rider/General made no formal distribution to its shareholders during these years. Nothing in the record indicates how Rider/General determined the salary to be paid to Stratmore. Rider/General is presently a profitable business but is still borrowing for its operations. The following chart shows the slary paid to Stratmore claimed deductible by Rider/General and the amounts allowed and disallowed by respondent for the taxable years 1970, 1972, 1973 and 1974: FYE
Salary
October 31
Claimed
Allowed
Disallowed
1970
$ 72,383
$ 53,000
$ 19,383
1972
122,730
59,550
63,180
1973
126,500
63,123
63,377
1974
166,365
66,910
99,455
Respondent also disallowed $ 3,775, $ 10,188 and $ 9,928 for the taxable years 1972, 1973 and 1974, respectively, for pension contributions attributable to the amounts of disallowed salary. [27] Determination of the amount of reasonable compensation *723 for the years 1972 and 1973 is important in the calculation of Rider/General's net operating loss claimed for those years in the amounts of $ 276,805 and $ 167,447, respectively, which may be carried back to 1969 and 1970 and forward to 1974. OPINION Rider/General paid Stratmore compensation of $ 72,383, $ 122,730, $ 126,500 and $ 166,365 for its taxable years 1970, 1972, 1973 and 1974, respectively. Respondent determined that reasonable compensation to Stratmore was $ 53,000, $ 59,550, $ 63,123 and $ 66,910 for the taxable years 1970, 1972, 1973 and 1974, respectively. Respondent accordingly disallowed deductions to Rider/General for the amounts paid to Stratmore in excess of the amounts determined by respondent to be reasonable. As stated supra section 162(a)(1) allows as a deduction a reasonable allowance *724 for salaries or other compensation for services rendered. Section 1.162-7(a), Income Tax Regs. provides that: The test of deductibility in the case of compensation payment is whether they are reasonable and are in fact payments purely for services. Section 1.162-7(b)(3), Income Tax Regs., explains: It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. Whether the compensation is reasonable in amount [28] *725 is a factual question to be resolved under the facts and circumstances of the particular case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The factors generally considered relevant in determining the reasonableness of compensation include: * * * the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court]. Commercial Iron Works v. Commissioner,166 F.2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra at 567-568; Dahlem Foundation, Inc. v. Commissioner,54 T.C. 1566, 1579 (1970). No single factor is decisive; we *726 must evaluate the entire situation of the instant case in light of all of the above factors. Mayson Mfg. Co. v. Commissioner,supra.The burden of showing that the compensation was reasonable is on Rider/General. Botany Worsted Mills v. United States,278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.
Rider/General maintains that the salaries in issue were reasonable in their entirety by emphasizing the wide range of Stratmore's duties and Stratmore's singular role in keeping the corporation functioning. Rider/General contends that while the salaries paid Stratmore may have seemed large to respondent's agent on audit, this Court frequently recognizes the reasonableness of large salaries when the success of the corporation was due to the efforts of the individual concerned, citing Home Interiors and Gifts, Inc. v. Commissioner,73 T.C. 1142 (1980) and Laure v. Commissioner,70 T.C. 1087 (1978), affd. in part, revd. in part and remanded 653 F.2d 253 (6th Cir. 1981). Respondent, on brief, points to several factors in support of his argument that the salaries paid to Stratmore for the taxable years 1970, 1972, 1973 and 1974 were unreasonable. Among such *727 factors were Rider/General's failure to make distributions to its shareholders, the huge increases in Stratmore's salary over the years without a corresponding increase in Rider/General's sales or income, Rider/General's failure to present evidence of comparable salaries paid by comparable business under comparable circumstances and Stratmore's dominant position in the operations of Rider/General. We agree with respondent. We find both Homes Interiors and Gifts, Inc. v. Commissioner, supra, and Laure v. Commissioner,supra, to be quite inapposite to the case herein. In Home Interiors and Gifts, Inc. compensation for three officers for the years 1971 to 1975 was in issue. The petitioner presented expert testimony based on salaries paid to officers of comparable companies. Additionally, the success of the petitioner was quite extraordinary; gross sales increased almost 23 times between 1968 and 1975, pretax earnings increased about 108 times between 1968 and 1975 and after-tax earnings increased over 114 times during the same period. The petitioner also showed the manner in which the compensation in issue was determined and how the compensation of other employees of the petitioner *728 was determined. Furthermore the petitioner's aggregate dividends and dividends per share increased dramatically between 1968 and 1975. Laure similarly involved a remarkably successful corporation. In Laure the compensation paid in 1972 and 1973 to the petitioner's founder, sole shareholder and president was challenged by the respondent. The petitioner again offered expert testimony of comparable salaries paid by comparable enterprises. The petitioner grew from formation in 1955 to taxable income before the president's compensation and net operating loss deduction of some $ 350,000 in each year in issue. While the petitioner in Laure did not pay dividends there was evidence of restrictions, required by a lender, upon its ability to do so. The petitioner's retained earnings were around $ 1 million and the sole shareholder-president had recently been offered $ 3 million for his stock in the petitioner. Rider/General emphasized Stratmore's qualifications and importance to the company. While the indispensability of Stratmore's services to the continuing existence of Rider/General cannot be denied, we do not think that Stratmore's compensation was reasonable. First, nothing in *729 the record indicates how the corporation determined the compensation paid to Stratmore. In the taxable year 1967 Rider/General showed a taxable income of approximately $ 225,000, before taking into account Stratmore's salary and the net operating loss deduction, and Stratmore was paid $ 41,818. In the taxable year 1974 Rider/General's taxable income, before Stratmore's salary and the net operating loss are taken into account, was approximately $ 145,000 and Stratmore was paid $ 166,365 in salary, which resulted in a taxable income, prior to the net operating loss deduction of $ (21,345). Nothing before us indicates why Stratmore's salary should have increased 4-fold between 1967 and 1974 and about 15 times between 1966 and 1974. [29]Rider/General's performance certainly does not justify the tremendous increase in Stratmore's salary between 1966 and 1974. Rider/General's gross sales in 1966 and 1974 were $ 1,895,124 and $ 1,958,731, respectively. Sometime around 1968 Rider/General sold its commercial refrigeration division, leaving the corporation operating only its aircraft engine component division, yet the increase in gross sales between 1969 ($ 1,676,042) and 1974 ($ 1,958,731), *730 was approximately $ 282,000, or only about 16 percent. Further, Rider/General's taxable income before the net operating deduction went f rom $ 232,719 in 1969 to ($ 21,345) in 1974. Yet, Stratmore's salary increased from $ 70,591 in 1969 to $ 72,383 in 1970 and then to $ 122,730, $ 126,500 and $ 166,365 in 1972, 1973 and 1974, respectively. Rider/General clearly was not, at the times these salaries were paid, the success story that the petitioners in Home Interiors and Gifts, Inc. and Laure were. While Rider/General had, after the disposition of its commercial refrigeration division in the late 1960's, begun to turn a yearly profit, its earned surplus and undivided profits was always a negative figure. Indeed, in the period from 1970 to 1974, when Rider/General's earned surplus dropped from ($ 412,022) to ($ 754,684), Stratmore's salary increased from $ 72,384 to $ 166,365. In the taxable years 1972 and 1973, when Rider/General suffered net operating losses of $ 276,805 and $ 167,447, *731 respectively, Stratmore was paid salaries of $ 122,730 and $ 126,500, respectively while Stratmore's 1970 salary was $ 72,383. Rider/General stresses that the aircraft engine component industry was quite volatile, subject to rapid upturns and downturns according to the fluctuations of Congress and the economy. While this contention is not borne out by the record, it appears that Rider/General's fortunes improved from 1967 until about 1970 or 1971, when Rider/General had three consecutive losing years. [30] However, during this down period Ricer/General dramatically increased Stratmore's salary. We also note that Stratmore's salary as a percentage of gross sales increased significantly from 1966 until 1974 cf. Home Interiors and Gifts, Inc. v. Commissioner,supra at 1160-1161. *732 Further, no distributions were made by Rider/General to its shareholders, i.e. Stratmore, his wife and his brothers. [31] While we have no doubt that Stratmore alone was responsible for the resuscitation of Rider/General through his various activities, the record simply does not justify the amounts being paid to Stratmore as compensation. We think that respondent has allowed reasonable amounts of compensation to Stratmore under the facts and circumstances. Accordingly, we sustain respondent's determination in full. Issues (8) & (9)
FACTS During the taxable years 1966 and 1967 Rider/General issued checks payable to Stratmore and to Stratmore and a second payee in the amounts of $ 70,660 and $ 68,500, respectively. With the exception of one $ 500 check dated August 3, 1967, Stratmore cashed these checks and turned over the proceeds *733 to various lenders as interest due on sums borrowed for Rider/General. Rider/General's books and records, which contained entries based on Stratmore's instructions to its bookkeepers, reflect these amounts as interest payments. Rider/General claimed $ 70,660 and $ 68,500 as deductions on its returns for the taxable years 1966 and 1967, respectively. Stratmore did not include any of these amounts in income. During 1966 and 1967 Rider/General also paid Stratmore "travel and entertainment" expenses of $ 67,843.20 and $ 17,365.32, respectively, which amounts Rider/General deducted on its returns for such years. The "travel and entertainment expenses" were not expended by Stratmore for the purpose designated, but were intended to furnish Stratmore with additional funds to meet his personal obligations. Rider/General designated these amounts as travel and entertainment expenses because the corporation had previously agreed to restrict Stratmore's salary. Stratmore included these payments as compensation on his returns.
Rider/General and Stratmore executed timely and valid agreements consenting to extend the statute of limitations for all years before the Court with the exception of *734 the taxable years 1966.Rider/General's return for the taxable year 1966 was filed on April 15, 1967. The statutory notice of deficiency issued to Rider/General for the taxable years 1966 and 1967 was mailed on June 28, 1974. OPINION Section 6653(b) provides that if any part of an underpayment of tax required to be shown on a return is due to fraud, then there shall be added to the tax an amount equal to 50 percent of the underpayment. Section 6501(a) states, in pertinent part, "Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * *." Section 6501(c)(1) provides that "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time." Respondent bears the burden of proof of fraud, section 7454(a), which must be established by clear and convincing evidence, Rule 142(b), Tax Cort Rules of Practice and Procedure. Respondent must show that Rider/General and Stratmore intended to evade taxes which were known to be due or owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968); *735 Danenberg. v. Commissioner,73 T.C. 370, 393 (1979). In the case of a corporation, fraud may be established through the intentions of the corporate officers and agents, Auerbach Shoe Co. v. Commissioner,216 F.2d 693, 697 (1st Cir. 1954), affg. 21 T.C. 191 (1953); American Lithofold Corp. v. Commissioner,55 T.C. 904, 925 (1971); Botwinik Brothers of Mass, Inc. v. Commissioner,39 T.C. 988, 996 (1963). Because fraud can seldom be established by direct proof, a finding of fraud may be based upon circumstantial evidence and reasonable inferences drawn from the record. Stoltzfus v. United States,supra at 1005. However, fraud will not be imputed or presumed, Carter v. Campbell,264 F.2d 930, 936 (5th Cir. 1959). Respondent argues that Rider/General, via Stratmore, engaged in fraud by falsely claiming interest deductions for amounts which were diverted to Stratmore's use. Respondent alleges that Stratmore's fraud resulted from his failure to report these sums as income. We have found that only $ 500 of the approximately $ 139,000 involved was kept by Stratmore, such amount being kept in 1967. Our finding is based on the endorsement on the bank of the $ 500 check issued by Rider/General. *736 No showing has been made by respondent, however, which would establish that Stratmore caused Rider/General to claim a fraudulent interest deduction with respect to the $ 500, or that Stratmore fraudulently failed to include the $ 500 in income. Therefore, we find that no fraud existed as to the interest deductions claimed by Rider/General for its taxable years 1966 and 1967 or as to Stratmore for 1966 and 1967. Respondent also argues that the travel and entertainment expenses deducted by Rider/General in 1966 and 1967 were fraudulent. Rider/General contends that this argument is a new issue which should not be considered by this Court. Respondent's answer, in which was pleaded the affirmative allegations of fraud on both the part of Rider/General and Stratmore, only alleged that the claimed interest payments were fraudulent. In his opening statement respondent's counsel stated that respondent should not be bound by the pleadings on the issue of fraud and that further indicia of fraud, which might include the travel and entertainment deductions, may turn up at the trial. Respondent then asserted on brief that Rider/General fraudulently claimed travel and entertainment deductions. *737 Generally speaking, when a new issue is raised the burden of proof thereon shifts to the respondent, Rule 142(a), Tax Court Rules of Practice and Procedure. However, in the case where fraud is asserted the burden of proof is upon the respondent ab initio. [32] This Court need not hear a theory where surprise and substantial disadvantage to the petitioner in the presentation of his case occur "because of the manner in which the statutory notice and pleadings were drawn when compared to the issues raised at trial," Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973). We need not consider whether Rider/General was surprised and substantially disadvantaged by respondent's argument regarding the travel and entertainment deductions because no evidence of fraud is in the record as to those items. [33] Accordingly, we find the additions to tax for fraud of Rider/General and Stratmore to be improper and, therefore, the taxable years 1966 are closed as to those parties *738 by reason of the statute of limitations. Issue (10)
FACTS During 1966 and 1967 Howald made loans to Rider/General through Prospect Park. Howald maintained an account at Prospect Park in the name of Howald Factoring Co. Howard made loans to Rider/General personally as well as by way of the Howald Factoring account. During 1966 and 1967 Rider/General checks payable to Howald Factoring in the total amounts of $ 2,500 and $ 7,000, respectively, were endorsed by Howald. During 1966 and 1967 Rider/General checks payable to Howald Factoring in the total amounts of $ 3,304.09 and $ 3,050.58, respectively, were endorsed by Roy Kay without Howald's knowledge. All the Rider/General checks made payable to Howald Factoring were deposited in that account, whether endorsed by Howard or by Kay. Howald reported $ 1,676.99 of interest from Rider/General on his 1966 return and no interest from Rider/General on his 1967 return. Irving Hess (Hess) is a Certified Public Accountant who has prepared Howald's *739 tax returns for about 20 years. Hess prepares the tax returns for Howald's businesses as well.According to both Hess and Kay, Howald is a poor recordkeeper. Hess felt that he could not rely on Howald to give him reliable information other than in the form of check registers, check stubs, deposit slips and bank statements. Howald maintained no records concerning loans made to Rider/General. Howald did not tell Hess that he received interest from Rider/General during 1967. Howald turned over to Hess all of Howald Factoring's bank records, including check stubs, deposit slips and bank statements. Howald also gave Hess all of his Forms 1099 for the preparation of his returns. Hess was never given any Form 1099 issued to Howald or Howald Factoring by Rider/General. Rider/General did not issue Forms 1099 to Howald. Hess was aware that Howald Factoring had loans outstanding from which interest was being received but did not know the borrower's identity. Howald Factoring's bank statements and records did not detail the principal and interest amounts received. Hess did not know the total amount of loans outstanding from Howald Factoring. At Howald's direction Hess would contact *740 someone at Prospect Park, either Kay or another employee of the bank, to determine the amounts of Howald Factoring's interest income. Hess only asked Prospect Park about Howald Factoring's interest income. Hess did not check the interest income figures which were given to him by Prospect Park, but regarded them as accurate.Hess cannot recall whether he normally received this information from Kay or someone else at Prospect Park, but he does recall relying upon the bank to give him an accurate figure for Howald Factoring's interest income. Kay cannot recall if he was requested by Howald to keep track of Howald Factoring's loans to Rider/General, nor does he recall whether he gave the amounts of Howald Factoring's interest income from Rider/General to Howald or Hess for 1966 or 1967. Kay is contacted annually by Hess for information about Howald's interest paid to and received from Prospect Park. Kay knows that Howald and Hess depend upon him to provide accurate information with respect to Howald's loan transactions with Prospect Park. When Howald gave Hess his bank records and other records he also gave Hess a blank Form 1040 signed by himself and Mrs. Howald. Hess would then prepare *741 Howald's return and, if time allowed, would advise Howald of the tax due and Howald would then prepare a check in that amount which would be attached to the return by Hess. If there was not enough time for Howald to send the check for the tax due to Hess, then Hess would send Howald's return in without a check. In that case, Howald sent a check, indicating his social security number thereon, to the appropriate service center as payment. Respondent and Howald have stipulated that the statute of limitations is a bar to assessment of any deficiencies for 1966 and 1967 unless respondent's determination of fraud is upheld. OPINION Section 6653(b) provides that if any part of an underpayment of tax required to be shown on a return is due to fraud, then there shall be added to the tax an amount equal to 50 percent of the underpayment. Section 6501(a) states, in pertinent part, "Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * *." Section 6501(c)(1) provides that, "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in *742 court for collection of such tax may be begun without assessment, at any time." Respondent bears the burden of proof of fraud, section 7454(a), which must be established by clear and convincing evidence, Rule 142(b), Tax Court Rules of Practice and Procedure. Respondent must show that Howald intended to evade taxes which were known by him to be due and owing. Stoltzfus v. United States,supra, at 1014; Danenberg v. Commissioner,supra at 393. Because fraud can seldom be established by direct proof, a finding of fraud may be based upon circumstancial evidence and reasonable inferences drawn from the record, Stoltzfus v. United States,supra at 1005. However, fraud will not be imputed or presumed, Carter v. Campbell,supra at 936. Respondent asserts that Howald received unreported interest from Rider/General checks of $ 5,804.09 and $ 8,521.82 during 1966 and 1967, respectively. [34] Respondent maintains that Howald deliberately concealed Rider/General as a source of taxable income from his return preparer, which is clear evidence of fraud, Drieborg v. Commissioner,225 F.2d 216 (6th Cir. 1955). Respondent also argues that Howald attempted to shift the responsibility for the failure *743 to report substantial amounts of interest income to others who Howald knew or should have known did not have sufficient information to accurately prepare his returns. Howald argues that respondent has made no showing of fraud on Howald's part and that while Howald may have been a negligent recordkeeper, such negligence does not amount to fraud. We find that respondent has not established fraud on Howald's part by clear and convincing evidence. Our finding is partially a result of the stakeholder position which respondent took at trial and partially a result of the different burdens of proof required for a deficiency determination and a fraud determination. We must be careful not to allow Howald's failure to carry his burden of proof as to the deficiency establish that respondent has carried his burden of proof as to fraud. [35]
Respondent's evidence established that the Howald *744 Factoring account received $ 5,804.09 and $ 10,050.58 in checks from Rider/General during 1966 and 1967, respectively. Howald endorsed checks totalling $ 2,500 and $ 7,000 during 1966 and 1967, respectively, the remainder were endorsed by Kay without Howald's knowledge. Howald could not establish that the amounts received from Rider/General did not constitute interest. However, respondent did not present any evidence which would show that these amounts were interest. Other than the loans to Rider/General which we found Howald took over from Roosma, no proof of other loans to Rider/General appear in the record. Similarly, we cannot find an intent on Howald's part to evade a tax known to be due and owing. Howald was a poor record-keeper who was truly unaware of the payments being made to and from the Howald Factoring account, which were handled by Kay.We cannot find fraudulent interest on Howald's part based on his negligent books and records. Nor can we find that Howald in any manner attempted to mislead or conceal income from Hess. Accordingly, we find that no fraud existed as to Howald's 1966 or 1967 returns and therefore the statute of limitations bars assessment as to those *745 years. [36]
Decisions will be entered under Rule 155 in docket Nos. 7883-74, 7887-74 and 9214-77.
Decision will be entered for petitioners in docket No. 7039-77.
Decision will be entered for the respondent in docket No. 9227-77.
Footnotes
1. The following cases have been consolidated herein for purposes of trial, briefing and opinion: Benjamin and Helen Stratmore, docket No. 7887-74; John Howald and Mary Howald, docket No. 7039-77; B.B. Rider Corp. a/k/a General Manufacturing Corp., docket No. 9214-77; and Benjamin Stratmore and Helen Stratmore, docket No. 9227-77.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. Respondent has conceded that petitioner Mary Howald's liability is limited to the deficiencies in tax, if any. 4. Respondent has conceded that the second statutory notice for the taxable year ended October 31, 1967 is invalid (see section 6212(c)(1)). Respondent claims an increased deficiency in the amount of $ 1,235 in docket No. 7883-74 for the taxable year ended October 31, 1967 pursuant to section 6214(a).↩
5. Respondent concedes that the taxable year ended October 31, 1969 is closed by the statute of limitations except for adjustments to the net operating loss carried back to such year.
6. The Bankruptcy Act has been substantially modified since that time by the Bankruptcy Act of 1978, P.L. 95-598, 92 Stat. 2549.↩
7. In fact, Howald did make a $ 25,000 loan to Rider/General secured by a chattel mortgage on the corporation's machinery. The value of the machinery was estimated by Stratmore to be approximately $ 500,000. The $ 25,000 loan was made by Cedar Knolls Enterprises, a corporation wholly-owned by Howald and Mary Howald, and the chattel mortgage and note evidencing the loan were eventually cancelled. This loan is not in issue herein.↩
8. The seemingly out of sequence date of several checks is most likely due to Rider/General's occasional issuance of post-dated checks in lieu of promissory notes.↩
9. Kay's approval of checks was signified by the notation "OKK" next to the endorsement.↩
10. The excess of the payments made by Howald to Roosma over the outstanding balance of the loan, or $ 2,085.29, was credited by Rider/General to Howald on March 14, 1967.
11. While the note is dated March 3, 1967, Rider/General's loan card for Howald Factoring reflects a payment of principal of $ 573.12 on February 28, 1967, which resulted in a balance of $ 28,926.75 as of March 3, 1967, not $ 29,499.87. This discrepancy is not explained in the record.↩
12. This lender is not otherwise identified in the record.↩
*. While pp. 13-15 show a total of $ 10,050.58 in checks made payable to Howald Factoring during 1967, the $ 1,528.76 difference results from check number 0158, which was in the amount of $ 2,028.76. Only $ 500 of check number 0158 represented interest according to Rider/General's records.
13. See Churukian v. Commissioner,T.C. Memo. 1980-205↩.
14. While the Ninth Circuit's opinion in Weimberskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977) supports Rider/General's and Stratmore's statement that respondent must introduce substantive evidence before the presumption of correctness attaches, supra at 362, note 8, this Court has not adopted that standard, Llorente v. Commissioner,74 T.C. 260, 266, note 4 (1980), affd. in part, revd. in part and remanded 649 F.2d 152 (2nd Cir. 1981). In Jackson v. Commissioner,73 T.C. 394 (1979), after finding the notice of deficiency arbitrary and excessive based on the testimony of respondent's witnesses, we stated that, "What the result might have been had the Government offered no evidence we are not prepared to say," supra at 403 (emphasis in original). In Gerardo v. Commissioner,552 F.2d 549 (3rd Cir. 1977), revg. T.C. Memo. 1975-341, the Third Circuit found that no evidence was presented "which would support an inference of the taxpayer's involvement in gambling activity" during a specific period, 552 F.2d at 554. The Court stated: Without that evidentiary foundation, minimal though if [sic] may be, an assessment may not be supported even where the taxpayer is silent.See Pizzarello v. United States,supra at 583. While we realize the difficulties which the Commissioner encounters in assessing deficiencies in circumstances such as are presented here, we nevertheless must insist that the Commissioner provide some predicate evidence connecting the taxpayer to the charged activit if effect is to be given his presumption of correctness." [552 F.2d at 554 (emphasis supplied)]. The Third Circuit stated recently, in DeCavalcante v. Commissioner,620 F.2d 23, 27 (3rd Cir. 1980), affg. T.C. Memo. 1978-432, that: Gerardo, therefore, stands for the proposition that the "Commissioner [must] provide some predicate evidence connecting the taxpayer to the charged activity." The Commissioner correctly points out that this was not intended to alter radically the presumption of correctness which attaches to tax assessments; Gerardo recognizes that the "predicate evidence" may be "minimal." (citation omitted) We express no opinion as to the correctness of Gerardo but note, as we have supra, that certainly much more than "minimal evidence" has been presented by respondent to supply an inference that Stratmore was in receipt of the proceeds in issue. Whether Stratmore retained those proceeds or paid them to lenders as interest awaits resolution.
*. See p. 29, supra.
** See pp. 15-17, supra.↩ From the schedules for the calendar years 1966 and 1967 we have determined, based on the date of each check, the checks issued during each of Rider/General's taxable years in issue.
15. Respondent stated: I really at this point do not have any evidence in our files as to exactly what this whole transaction is about. And, if that's the way the record stays, when I just don't know what it's about, I will concede that it's not income to Mr. Stratmore. But it may be that facts will come into the record about this.↩
*. Rider/General's return lists $ 65,615.76 as Stratmore's expense account allowances, however the parties agree that $ 59,615.76 is the amount in issue. ** Rider/General's return lists $ 43,675.52 as Stratmore's expense account allowances, however the parties agree that $ 52,316.39 is the amount in issue.↩
*. The Stratmores' joint return for 1964 states total salaries of $ 14,000. Stratmore's salary is not listed separately.↩
16. We note that this evidence was only presented as to the taxable years 1966 and 1967. As to the other three taxable years during which Rider/General made disputed travel and entertainment payments to Stratmore no evidence was adduced.↩
*. The Stratmores' return for 1964 does not list the individual salaries, only the combined amount of $ 14,000.↩
*. Although the Stratmores and respondent stipulated to $ 35,141.53 as the amount paid during 1964 the correct amount is $ 34,141.53. The latter amount was the amount claimed as a business bad debt on the Stratmores' 1969 return and the amount disallowed by respondent in the notice of deficiency.
17. Respondent does not contend that the Stratmores should be collaterally estopped herein by the decision in Stratmore v. United States,420 F.2d 461 (3rd Cir. 1970). In that case, decided before United States v. Generes,405 U.S. 93↩ (1972), the Third Circuit held that the payments on the Stratmore's guarantees resulted in nonbusiness bad debts whether the "dominant motive" standard or "significant motive" standard was applied.
18. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debt.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
19. Section 166(d) provided, during the years in issue: (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. For the years 1961 through 1969, section 1211(b) provided as follows: SEC. 1211. LIMITATION ON CAPITAL LOSSES. (b) Other Taxpayers.-- (1) In general.--In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $ 1,000, whichever is smaller. * * * Section 1211(b) was amended by section 513(a) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, effective for calendar years beginning after December 31, 1969 to provide as follows: (b) Other Taxpayers.-- (1) In general.--In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) whichever of the following is the smallest: (A) the taxable income for the taxable year, (B) $ 1,000, or (C) the sum of-- (i) the excess of the net short-term capital loss over the net long-term capital gain, and (ii) one-half of the excess of the net long-term capital loss over the net short-term capital gain. Subsequent amendments to section 1211 have no bearing on the present case.↩
20. The agreements in the instant case are sufficient, under Federal tax law, to create guarantees. See Stratmore v. United States,420 F.2d 461, 464-465 (3rd Cir. 1970) and United States v. Hoffman,423 F.2d 1217 (9th Cir. 1970). In Stratmore the Third Circuit stated that the essence of Putnam v. Commissioner,352 U.S. 82 (1956) was to provide a common tax treatment (under section 166) for all losses suffered by a corporate stockholder in providing his corporation with financing, 420 F.2d at 465↩.
21. See also Rev. Rul. 71-561, 1971-2 C.B. 128; Cho v. Commissioner,T.C. Memo. 1976-318 and Morey v. Commissioner,T.C. Memo. 1978-412, affd. by unpublished opinion (4th Cir. February 6, 1980).
22. The distinctions between the status of guarantor and that of indemnitor is not important, United States v. Hoffman,supra↩ at 1218.
23. We note that the Stratmores' combined salaries, for the years 1961 through 1965, consisted of 4 years at $ 13,750 and 1 year (1964) at $ 14,000. Only after 1966 did their salaries begin to escalate. While no evidence was presented as to the duration of the salary limitation agreement, we suspect that such agreement expired in approximately 1965.
24. The major exception to this rule allows a deduction for interest paid upon a mortgage on real estate of which the taxpayer is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage. Section 1.163-1(b), Income Tax Regs. For an illustration of the narrow nature of this exception, see Golder v. Commissioner,604 F.2d 34 (9th Cir. 1979), affg. T.C. Memo. 1976-150↩.
25. See also Hamrick v. Commissioner,T.C. Memo. 1980-149↩.
26. Rider/General's tax returns for the taxable years 1971 through 1973 are not in the record. All figures in the following table are rounded to the nearest dollar.↩
*. Returns and allowances on Rider/General's sales varied from a high of $ 95,420 in the taxable year 1966 to a low of $ 15,282 in the taxable year 1974. ** This column does not include travel and entertainment expenses claimed to have been paid Stratmore as compensation. *** Taxable income shown on return prior to Rider/General's net operating loss deduction.↩
27. Respondent and Rider/General stipulated to the disallowed pension contributions only for 1972 and 1973. Both the statutory notice and the "Stipulation of Issues" submitted by Rider/General, the Stratmores and respondent include the pension contribution for 1974, therefore the failure to stipuate to that item is apparently an oversight on the part of Rider/General and respondent.↩
28. Respondent does not dispute that the payments to Stratmore during the taxable years 1970, 1972, 1973 and 1974 are, unlike the travel and and entertainment expenses in Issue (3), truly compensatory in nature.
29. Rider/General does not contend that Stratmore was compensated for services rendered in prior years, for which he had been undercompensated, cf. Lucas v. Ox Fibre Brush Co.,281 U.S. 115↩ (1930).
30. Although Rider/General's 1971 return is not in evidence, Rider/General must have had an increase in earned surplus in 1971 of about $ 125,000. Rider/General's earned surplus as of October 31, 1970 was ($ 412,022) and Rider/General suffered total losses of about $ 466,000 from 1972-1974, while the earned surplus as of October 31, 1974 was ($ 754,684), a cumulative loss of about $ 334,000 from October 31, 1970.↩
31. We note that the Stratmores owned one-third of the stock of Rider/General while Stratmore's two brothers owned the remaining two-thirds. While Stratmore was thus not in a position to dictate Rider/General's affairs, the closely held nature of Rider/General requires us to give special scrutiny to the facts, Mennuto v. Commissioner,56 T.C. 910, 921↩ (1971).
32. Because the burden of proof as to fraud rests upon the respondent the importance of distinguishing between new issues and new reasons does not exist. See Estate of Horvath v. Commissioner,59 T.C. 551, 555↩ n.2 (1973).
33. We do express doubts, however, as to whether we could properly consider theories developed on brief simply on the basis of counsel's opening statement that further facts may be subsequently uncovered.↩
34. Respondent has, on reply brief, clearly abandoned any argument that Howald received unreported cash↩ interest from Rider/General which would establish fraud on Howald's part. (Respondent's reply brief, p. 23.)
35. See the excellent discussion of this problem in Ginsburg v. Commissioner,T.C. Memo. 1976-199↩.
36. Because of our holding that the Howalds' years 1966 and 1967 are closed by the statute of limitations, the issue of Mrs. Howald's status as an innocent spouse in 1966 under section 6013(e) is moot. However, we note that the Howalds' 1966 unreported income of $ 28,928.17 ($ 6,107.80 dividends and gain plus $ 22,820.37 interest) is less than 25 percent of the Howalds' reported 1966 gross income of $ 130,117.18, section 6013(e)(1)(A).↩